IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| MARY E. WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:10-cv-375 |
| | ) | |
| MICHAEL J. ASTRUE, in his Capacity as | ) | Judge Thomas A. Wiseman, Jr. |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

Before the Court is Plaintiff Mary E. White's Motion for Judgment on the Administrative Record (Doc. No. 14), seeking judicial review of the Commissioner's denial of her claim for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act") and Supplemental Security Income ("SSI") under Title XVI of the Act. Plaintiff seeks reversal of the Commissioner's decision or, in the alternative, remand pursuant to sentence four of 42 U.S.C. § 405(g). In response to the motion, the Defendant Commissioner of Social Security asserts that the agency's decision denying benefits is supported by substantial evidence in the record and should be upheld.

The prior referral of this case to the Magistrate Judge is withdrawn and the Court finds, as explained below, that Commissioner's decision is supported by substantial evidence. Plaintiff's motion will therefore be denied and the underlying decision by the ALJ affirmed.

I.      BACKGROUND

A.      Procedural history

Plaintiff applied for DIB and SSI on January 19, 2007. (Doc. No. 12, Certified Transcript of Administrative Record ("AR") 46.) The claim was denied initially and upon reconsideration. (AR 53, 57; 64, 66.) Upon Plaintiff's request, a hearing was conducted on September 3, 2009 before Administrative Law Judge ("ALJ") Donald E. Garrison. Plaintiff was represented by counsel at the hearing. The ALJ issued his decision denying Plaintiff's claim on September 30, 2009. (AR 7–22.) Plaintiff's request for review by the Appeals Council was denied on February 17, 2010, rendering the ALJ's decision the final decision of the Commissioner. Plaintiff filed this action on April 13, 2010, seeking review of that decision

pursuant to 42 U.S.C. § 405(g).

**B.      Plaintiff's Age and Education**

Plaintiff was born in July 1959 and was forty-nine and one-half years old on her alleged disability onset date of January 29, 2009, as amended at the hearing.  (The original alleged onset date was January 1, 2006.)  Plaintiff was fifty years old at the time of the hearing.  Plaintiff has a high school education.

**C.      Plaintiff's Medical History**

As the ALJ noted, Plaintiff's early medical history suggests significant drug and alcohol abuse, but such abuse was in remission at least during the period from October 2006 through the date of the hearing before the ALJ.

*1.      Treatment Records from the Mental Health Cooperative – December 2006 through May 2009*

Plaintiff received mental health treatment from the Mental Health Cooperative ("MHC") from December 4, 2006 through at least August 2, 2007.  (AR 178–247.)  The narrative initial intake form indicated Plaintiff was referred to MHC from the Hope Center where she had spent two months in a substance abuse rehabilitation program.  Plaintiff stated she had been unable to work due to depression and complained of daily depressed mood, problems sleeping, wide fluctuations in appetite, decreased energy, fatigue, decreased concentration, anhedonia, and irritability with others.  (AR 222.)  She reported she generally stayed to herself and did not interact with other women at the shelter where she was staying.  She reported visual hallucinations (seeing shadows and lights), auditory hallucinations (voices), and also complained of paranoia and being fearful of others.  (AR 222.)  She reported using alcohol and crack cocaine until October 4, 2006, but had been clean and sober since that date.

The intake Clinically Related Group ("CRG") Form dated December 4, 2006 assess Plaintiff as having "marked" impairment in activities of daily living, in that she was "unable to work due to depression; often neglects laundry and other chores; has difficulty focusing on her classes."  (AR 178.)  She was assessed as having moderate limitations in the areas of interpersonal functioning, concentration, task performance and pace, and adaptation to change.  (AR 178–79.)  Periods of dysfunction had accumulated to a total of six months or longer over the past year.  (AR 179.)  She was assigned a GAF score of 45.  (AR 180.)  Her diagnoses were polysubstance abuse, cocaine abuse, alcohol abuse, and

Major Depressive Disorder, Recurrent, Severe with Psychotic Features, based on her report of auditory and visual hallucinations.  (AR 181.)  She was noted to have received services for the same diagnoses in June 2002, at which time she was assigned a GAF score of 55.  (*Id.*)

She received treatment, including counseling and medications, with some regularity through July 2007, though she missed many appointments, and many others were focused on her need to obtain housing.  On August 2, 2007, she was complaining of "achey pain" in her lower back, abdomen, and left leg, and throat tingling.  She still experienced vague auditory and visual hallucinations, decreased appetite, poor sleep, and had consumed a six-pack of beer the prior week when she learned of her brother's death.  The physician's assessment included a provisional diagnosis of "bipolar nos & polysubstance dependence."  (AR 207.)  She was continued on her medications (Wellbutrin, Seroquel, Naltrexene).  She was living with her sister at the time and reported that they got along well.

Treatment notes from the Mental Health Cooperative from September 2007 through June 2009 document continued concern with obtaining or maintaining stable housing and disability benefits, and depression, and they include repeated reports of vague auditory and visual hallucinations ("hears people calling her and hears sounds like doors opening," and sees "bugs flying, shadows"). (AR 498.)  Plaintiff generally reported that her medication helped her sleep and helped her cut back on smoking but did not seem to be helping her mood or her hallucinations.  More specifically, in October 2007, in the context of requesting help from MHC in paying a deposit to NES, Plaintiff told her case manager that she was working and would be able to pay off some of the past-due amount herself.  (AR 504.)  Plaintiff then failed to appear for follow-up appointments in November and December, and her case manager was unable to contact her after repeated attempts, so the Case Manager closed the file as of January 15, 2008.  (AR 517.)  Plaintiff reappeared and was appointed to a new case manager in February 2008.  (AR 522.)  At that time, Plaintiff reported that she had medications but was going to run out soon, that she was "doing well at this time," had "stable housing in east Nashville," and her primary concern was scheduling a clinic appointment.  (AR 522.)  The case manager performed a home visit in March 2008 and reported that the home was "clean and orderly," that plaintiff reported no legal or financial concerns, that she was "working part time (off and on)," had a lawyer helping with disability and a long-term boyfriend helping her financially.  She reported no vocational goals and was primarily focused on keeping her clinic

appointment and getting new prescriptions for her medications.  (AR 525.)  At her first clinic appointment with a new provider, she reported having been out of medications for several months though she had some samples, that she had mild depression when on medications, worse when off.  She continued to report variable appetite, low energy and concentration, insomnia, and atypical auditory and visual hallucinations.  She reported she was still working part-time at CMS uniforms.  (AR 526.)  On the first home visit by her case manager, conducted the same day, the case manager noted that Plaintiff's apartment was clean, though Plaintiff reported she was depressed and had missed work all three days that week, but reported no financial or legal concerns and no physical health concerns at that time, and also indicated that her family was supportive of her.  (AR 527.)

Plaintiff's mood was documented as still depressed but somewhat improved over the next several months.  (AR 528–34.)  She was a no-show for counseling appointments in August and September 2008 (AR 535–540), but reappeared for a clinic appointment on September 22, 2008.  At that time she reported she had been hospitalized earlier in the month for pneumonia, and had also gone to Skyline Madison for detox approximately one month prior. (AR 541.)  On September 30, 2008, the case manager reported that on a home visit, Plaintiff's apartment was clean.  Plaintiff complained of periods of depression and indicated that the medications were helping but could be better, that work was going well and that she was enjoying work, and that she visited with her family frequently and in fact hoped to move from her apartment, which was in an unsafe area, so her family would come around more often.  (AR 543.)

In November 2008, she reported during a home visit that she was appealing her disability claim and was "looking forward to pursuing her disability," and that she was "not able to stand for long periods of time due to back pain."  (AR 550.)  She claimed her primary care physician wanted her to have surgery on her back but that she did not have the money for surgery or financial stability to recover from surgery.  (AR 550.)  She also reported socializing frequently with her family and that she "generally, goes out with her friends or family members to the mall or out to eat."  (AR 550.)

In December 2008, the case manager reported that Plaintiff was sick and that she "suffers from upper respiratory infections frequently" and that she was "a chain smoker and needs to consider to stop smoking."  (AR 552.)

In January 2009, she reported her Wellbutrin did not seem to be working as well as it had in the

past, and was noted to have irritability and anger outbursts, and poor coping and frustration tolerance. (AR 565.)  She reported having ulcers and seeking treatment for same at the ER.  (AR 565.)  Plaintiff lost her part-time job as a seamstress at the end of January 2009.

In March 2009, she claimed she was compliant with her medications but her mood had been "terrible"; she was unable to get out of bed and did not want to do anything, and had no energy.  She also had worry and anxiety because of the violence in her neighborhood.  (AR 568.)  In April 2009, she had increased financial worries because of losing her job; she reported poor concentration, depressed mood, and anhedonia.  Lithium was added to her medications, in addition to the Seroquel and Wellbutrin she was already taking.  (AR 572.)  She was no better in June 2009, and in fact was more depressed, reporting anxiety, panic attacks, crying spells, inability to concentrate, insomnia, and isolating herself, mostly in consequence to the recent death of one of her sisters.  (AR 578.)

CRG update forms from MHC indicate that Plaintiff was assigned a GAF score of 50 on September 7, 2007; of 60 on June 20, 2008, and 48 on May 4, 2009.  In support of the most recent GAF, the intake coordinator found "marked" limitations in the activities of daily living but noted only that the client had a history of "not keeping house clean" and was currently unemployed.  (AR 433.)  He found moderate limitations in the area of interpersonal functioning, noting:  "C[lient] has few friends but maintains close relationships w/ certain family members."  (AR 433.)  He found moderate limitations in the area of concentration, persistence and pace, noting that the client had "recently lost her job" and "relie[d] heavily on family for direction."  He likewise noted moderate limitations in the ability to adapt to change, in that Plaintiff "becomes depressed when dealing w/ change" and reported that "she is under a lot of stress because of recent job loss."  (AR 434.)  The 2008 assessment was virtually identical except that Plaintiff was assigned a GAF of 60 rather than 48, and the notes in support of marked limitation in ADLs stated that Plaintiff had "problems with keeping housing, job" and missed work and clinic appointments due to depression.  (AR 436.)  In September 2007, the assessment was again virtually identical, except in the area of ADLS it was noted that Plaintiff was "unable to work due to depression."  (AR 439.)  She was assigned a GAF score of 50.  (AR 441.)

### 2.    Physical Health Treatment Records 2006–2009

Plaintiff was involved in a motor vehicle accident in September 30, 2006.  In connection with the

accident, she had a routine x-ray of her cervical spine which showed spondylosis at C5, C6, loss of cervical lordosis suggesting muscle spasm, osteopenia, and anterior wedge deformity at C5 suggesting an old compression deformity. (AR 397.) The x-ray of her lumbar spine was normal, however. (AR 400.) It appears she was intoxicated at the time of the accident, and that this event prompted her to go into a drug and alcohol rehabilitation program.

Treatment notes from emergency departments and doctor visits over the next several years indicate repeated complaints of "achy" joint pain in her ankles, knees, elbows, wrists, and hands. X-rays of these joints in January 2007 were all normal, except the studies showed an old fracture deformity of one of the fingers in her left hand but no arthritis, and mild osteoarthritis in both knees. Fibromyalgia was suspected (*see* AR 294) but never affirmatively diagnosed. In January 2007, a rheumatoid arthritis ("RA") screening showed a positive RA Titer (AR 383), but another RA screen on March 30, 2007 was negative (AR 350). There is no indication in the record of a confirmed RA diagnosis or any follow-up or treatment for the condition. In addition, although Plaintiff reported to her mental health case worker that she had been told she should have surgery on her back, as stated above, the treatment notes that are included in the administrative record do not support that allegation; instead, Plaintiff was repeatedly noted to have full range of motion in all joints, and no obvious swelling or effusion.

Plaintiff was diagnosed with probable COPD in April 2007 (mild large airways obstruction and severe small airways obstruction). (AR 342.) She was prescribed an inhaler and advised to stop smoking. She was conclusively diagnosed with COPD in 2009. Otherwise, Plaintiff was treated at the ER for flu-like symptoms or pneumonia on several occasions, and urinary tract or vaginal infections on other occasions.

### 3. Consultant Reports – March 2007 through October 2007

Dr. Lloyd Huang performed a consultative medical examination on March 8, 2007. He noted that Plaintiff had a history of bipolar affective disorder and was followed by MHC but had never been hospitalized for mental illness. Plaintiff reported mood swings and occasional periods of being manic, as well as auditory and visual hallucinations. Physically, she complained of intermittent arthralgias, low back pain, shoulder pain and foot pain. Dr. Huang also noted Plaintiff had recently been discharged from an in-patient drug and alcohol rehabilitation program. Plaintiff reported she was attending AA, obtaining

psychiatric care from MHC, and that she took over-the-counter Tylenol, bupropion 150 mg two daily, and Seroquel 200 mg two nightly.  On examination, Dr. Huang found Plaintiff to have full range of motion and normal appearance of the cervical spine, lumbar spine, shoulders, elbows, wrists, hips, knees, and ankles; normal hand grip strength; negative straight leg raises; and no swelling or effusion at any joint. Motor strength was 5/5; DTRs were 2+ and symmetrical.  Dr. Huang noted:  "Her limiting factor appeared to be psychiatric in origin.  Also, in combination with the polysubstance abuse for which she has received recent treatment."  (AR 251.)  He estimated Plaintiff could lift thirty pounds occasionally and fifteen pounds frequently; stand and walk for six hours in an eight-hour work day; and sit for eight hours in an eight-hour work day.  (AR 251.)

Kathryn Sherrod, Ph.D., performed a consultative psychological examination on March 12, 2007. Based on her examination, Dr. Sherrod noted as follows:

> Ms. White showed poor social skills. . . .  She neither exhibited nor reported symptoms consistent with a manic episode to support a diagnosis of bipolar disorder.  It seems likely that her previously unpredictable behavior might have been due to drug abuse rather than to an underlying mental health disorder.  Her statements that she hears someone calling her name or a door slamming do not sound like typical hallucinations, but more like perceptual errors.  She said she sees shadows, which again is not like typical visual hallucinations.  During this evaluation, Ms. White completed the tasks as directed.  She maintained eye contact.  Her statements made sense and were generally clear.  She said she is responsible for her own hygiene and grooming when her arthritis does not interfere.  Her hygiene on the day of the evaluation was satisfactory except her nail polish was peeling.  According to her report, aside from getting food from the food bank, she is supported by her sister. . . .  She has had a long history of drug abuse and has had multiple D & A rehabilitation stays, with the most recent one ending a few months ago.  Ms. White has been drug free for five months.  It generally requires that a person be drug free for six to 12 months before they can be accurately diagnosed with mental health problems because the drugs create or exacerbate underlying mental health symptoms. . . .  Ms. White endorsed a high number of Frequency items, raising questions of whether she was exaggerating her symptoms.
> . . . .
> Ms. White's ability to understand and remember is within broad normal limits. Her concentration was mildly limited.  Her social skills appear to be severely limited. . . . Her knowledge of adaptive skills was reported to be within normal limits, but she said her physical problems interfere with her ability to complete some tasks. . . .  Given the bleach marks on her jeans (indicating that she did not dress appropriately for an evaluation), her adaptive skills are likely to be mildly to moderately limited. . . .  [S]he can get around independently by bus. . . .

(AR 258–59.)

A Mental Residual Functional Capacity Assessment was completed by Rebecca A. Hansmann, Psy.D., on April 3, 2007.  Dr. Hansmann assessed Plaintiff as moderately limited in her ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular

attendance and be punctual within customary tolerances; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (AR 260–61.) Dr. Hansmann indicated Plaintiff was not significantly limited in any other functional areas. In addition, she noted that Plaintiff could understand, remember, concentrate and persist for simple and detailed tasks, despite periods of increased symptoms; that she would not have substantial difficulty in interacting with the general public, co-workers or supervisors; and that she could adapt to infrequent change. (AR 262.)

On a DDS Medical Consultant Analysis form dated May 4, 2007, consulting physician William L. Downey opined that Plaintiff's physical impairments, singly or combined, were not severe. The narrative supporting his opinion noted that Plaintiff sought disability based on arthritis, blurred vision and a heart murmur, but that the only objective evidence of any physical abnormality included the October 2006 x-ray showing spondylosis at C5, C6, and more recent x-rays showing mild osteoarthritis of the knees. Dr. Downey considered the restrictions indicated by Dr. Huang to be "too restrictive based on objective physical findings including [range of motion] and x-rays." (AR 409.)

Dr. Lloyd A. Walwin completed another DDS Medical Consultant Analysis on August 20, 2007, in which he similarly found no severe physical impairments, and supported that opinion with reference to the same medical treatment notes upon which Dr. Downey relied, specifically noting that there were "[n]o additional medical treatment records provided to support [complaints of] worsening leg pain." (AR 413.)

Victor L. O'Brien, Ph.D., completed a Mental RFC Assessment on October 17, 2007, in conjunction with a Psychiatric Review Technique form. Dr. O'Brien assessed Plaintiff as moderately limited in her ability to (1) maintain attention and concentration for extended periods, (2) complete a normal work-day and work week without interruptions from psychologically based symptoms and perform at a consistent pace; (3) interact appropriately with the general public, (4) get along with coworkers and peers without distracting them or exhibiting behavioral extremes, and (5) respond appropriately to changes in the work setting. He found no other significant limitations, and further noted that Plaintiff should be able to do detailed work, and her ability in the area of concentration, persistence and pace was "limited, but adequate"; that she had some social problems but could interact appropriately in most

instances; and could adapt to moderate levels of stress and change.  (AR 428–30.)

###### D.    Plaintiff's Testimony at the ALJ Hearing

At the hearing on September 3, 2009, Plaintiff testified that she had attended school through the twelfth grade and could read and write, that she had had a driver's license but it was suspended for failure to pay a traffic ticket, and that she lived alone.  She had worked part-time as a seamstress for a uniform company for most of 2008 but was laid off in January 2009.  She described the job as "stressful," but she was able to work there, generally four days a week for four hours per day, until she was laid off.  (AR 28.)  While working there, she primarily hemmed pants and sewed on patches.  Most of the work was done on a sewing machine but she also did some hand stitching.  She claimed that she occasionally had verbal confrontations with her coworkers,[1] and that she missed a significant number of days of work before being laid off because there were days she "just couldn't get up" because of her depression and anxiety.  (AR 36.)  She claimed she sometimes missed as much as a week at a time but was not fired outright because she had previously worked with the supervisor and had known her for fifteen years.

The reasons Plaintiff gave for her disability were that she stayed "stressed out and upset and stuff like that," and that she had been diagnosed as bipolar.  (AR 29.)  She claimed to have difficulty concentrating and remembering, which was exacerbated by stress.

When asked if she had any significant physical limitations, Plaintiff responded that she had arthritis "all over," in her "knees and joints and fingers."  (AR 30.)  She also indicated, when prompted by her attorney, that she had difficulty breathing at times, for which she had an Albuterol inhaler.  She also smoked eight to nine cigarettes a day.

Plaintiff stated that on a typical day, sometimes she did not get out of bed at all.  On other days she might get up in the early afternoon, cook a meal, or sit and watch television.  She did not do much shopping but would leave the house to go to the grocery store.  She occasionally attended church.  She testified, in fact, that she obtained the seamstress job through a contact at her church.

Plaintiff indicated she had used alcohol and illegal drugs in the past but had been sober for at least two years since her last relapse.  She stated that she was unable to work because she "just stay[ed]

---

[1] This testimony is in apparent conflict with her statement on her Function Report – Adult dated February 8, 2007, in which she stated she "g[o]t along ok with" authority figures, that she "always g[o]t along with people."  (AR 143.)

stressed out all the time and depressed." (AR 31.)

E.     **Vocational Testimony at the Hearing**

Michele McBroom-Weiss, a vocational expert, testified at the hearing, and confirmed that her testimony was in accordance with the *Dictionary of Occupational Titles* ("DOT"). She stated that Plaintiff's past relevant work experience as a production inspector qualified as light, semi-skilled work. The VE was asked to consider a hypothetical person of Plaintiff's age, education and work experience; who was limited to medium work with frequent postural activities and no exposure to irritating inhalants; who could understand, remember and carry out only short and simple instructions; could make judgments only on simple, work-related decisions, and needed a job that did not require interaction with the public. The VE testified that such a person would be able to perform Plaintiff's past relevant work as a production inspector. The VE characterized Plaintiff's work in 2008 as a seamstress as light and skilled, and indicated that the hypothetical person with the limitations identified would also be able to perform that work. Likewise, if the person were limited to light work with occasional postural activities, no irritating inhalants, and the same mental limitations, she could still perform the past relevant work. Upon the ALJ's request, the VE identified a number of other unskilled, medium and light work that would be available to a person with the limitations imposed, including the jobs of janitor (medium), dishwasher (medium), laundry folder (light), production assembler (light), and folding machine operator (light).

Asked to assume that the person would not be able to work at jobs with changing work procedures or requirements but could instead only perform work with simple routine tasks, the VE stated that the same jobs she had identified would still be available. Asked to assume that the person was not able to work at production-rate paced quota jobs, the VE testified that the past relevant work of production inspector would not be available, but the past work of seamstress would be available. The VE testified that inability to work at production-rate pace would eliminate some of the other work she had previously identified, including the jobs of production assembler and folding machine operator, but the other jobs she had identified would still be available (including janitor and dishwasher at the medium level, and laundry folder at the light level). In addition, the VE added that other jobs at the light level would be available, including that of laundry ticketer.

The VE further testified that the jobs she identified could be performed by someone with a global

functioning assessment ("GAF") score between 51 and 60, but not by someone with a GAF score of 50 or lower.

The ALJ asked the VE to consider Exhibit 3F, the mental consultative examination report by Dr. Sherrod. Dr. Sherrod assigned a GAF score of 50, but the ALJ asked the VE to disregard that score and consider whether the limitations indicated would preclude work. The VE responded that with a "social" of "severe" and "adapt" at "mild to marked," it was unclear whether such a person could work. That is, if by "severe," the doctor meant that the person could have no contact with people, "then, of course, that would eliminate unskilled work. If they just need limited contact with people, then the positions identified are typically performed pretty independently. . . . So it depends on the interpretation of that severe." (AR 41–42.) The ALJ asked the VE to presume that the person was limited to occasional contact, meaning up to one-third of the work day, with co-workers and supervisors. The VE responded that all the jobs she identified would still be available.

The VE also indicated that if Plaintiff's testimony was found to be completely credible, she would not be able to perform any of the jobs identified. She also indicated that a person who "missed work more than a couple of days a month" would not be able to work consistently. (AR 43.)

## II. THE ALJ'S DECISION

In his decision dated September 30, 2009, the ALJ made the following specific findings:

1. The claimant [met] the insured status requirements of the Social Security Act through March 31, 2009.

2. The claimant has not engaged in substantial gainful activity since January 29, 2009, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: Osteoarthritis, Chronic Obstructive Pulmonary Disease (COPD), Major Depressive Disorder, and Antisocial Personality Disorder (20 CFR 404.1520(c) and 416.920(c)).

. . . .

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. . . .

. . . .

5. [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except as follows: The claimant is limited to jobs allowing for only occasional postural activities of climbing, balancing, stooping, crouching, kneeling and crawling. She is further limited to jobs with no exposure to irritating inhalants. She is further limited to jobs that require only short and simple instructions or the ability to make judgments on simple work-related decisions. She is

limited to only occasional contact with supervisors and co-workers, and no contact with the general public. The claimant is further limited to jobs that do not require production rate pace work, or require changes in work procedures and requirements.

. . . .

6.       The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . . .

7.       The claimant was born on July 16, 1959, and was 49 years old, which is defined as a younger individual age 18–49, on the amended alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age. . . . (20 CFR 404.1563 and 416.963).

8.       The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

. . . .

9.       Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

. . . .

11.      The claimant has not been under a disability, as defined in the Social Security Act, from January 29, 2009 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(AR 12–21.)

## III.    APPLICABLE LEGAL STANDARDS

### A.    Standard of Review

In social security cases, the Commissioner determines whether a claimant is disabled within the meaning of the Social Security Act and therefore entitled to benefits. 42 U.S.C. § 405(h). This Court must affirm the Commissioner's conclusions absent a determination that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir.1997); 42 U.S.C. § 405(g). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v.*

*Mathews*, 574 F.2d 359 (6th Cir. 1978)

The substantial-evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). "The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).

**B.      The Social Security Act and Disability**

The central issue on appeal is whether substantial evidence supports the ALJ's determination that Plaintiff was not disabled during the relevant time period. The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*Id.* § 423(d)(2)(A).

In making a determination as to disability under the above definition, an ALJ is required to follow the five-step sequential evaluation set out in the Social Security Administration's regulations. 20 C.F.R. § 404.1520.[2] The burden of proof is on the claimant through the first four steps; the burden shifts to the Social Security Administration in step five. *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994). However, the claimant always bears the ultimate burden of proving that he or she is entitled to disability benefits. 20 C.F.R. § 404.1512(a).

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are substantially identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 et seq.

Step one of the sequential process requires determining whether the claimant is engaging in substantial gainful activity. If not, the inquiry moves to step two, which determines whether the claimant's impairments, individually or in combination are "severe." If a severe impairment is found, step three asks whether the claimant's impairment meets or medically equals the requirements of any impairment in the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is not of listing-level severity, then step four asks whether the claimant has the residual functional capacity ("RFC") to perform past relevant work. If the claimant shows that she cannot perform past relevant work because of impairments, the Social Security Administration, in step five, must then identify other jobs existing in significant numbers in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(a)(4). If at any point it is determined that the claimant is or is not disabled, the inquiry stops. *Id.* For example, if the ALJ determines at step four that the claimant can perform past relevant work, the ALJ need not complete the sequential analysis. *See id.*

## IV. LEGAL ANALYSIS

Plaintiff claims that the ALJ committed reversible error in the following respects:

1. That the ALJ failed to properly evaluate and consider Plaintiff's mental health conditions, especially in light of the results of the consultative examination performed by Dr. Sherrod.

2. That the ALJ erred in concluding that Plaintiff had no more than moderate mental limitations based solely on her GAF scores.

3. That the ALJ erred at Step 5 of the sequential evaluation in finding that a significant number of jobs exist in the regional or national economy that Plaintiff could perform.

4. That the ALJ erred by failing to include manipulative limitations in the RFC he assigned to Plaintiff.

5. That the ALJ improperly evaluated Plaintiff's credibility under SSR 96-7P.

6. That the ALJ failed to properly evaluate and consider Plaintiff's severe impairment of COPD.

The Court will address each of these contentions in turn.

### A. Whether the ALJ failed to properly evaluate and consider Dr. Sherrod's Assessment

Plaintiff points out that the consultative examination conducted in March 2007 assessed Plaintiff as having a major depressive disorder with psychotic features and antisocial personality disorder, and that Plaintiff's social skills appeared to be severely limited. The examiner, Dr. Sherrod, also assigned

Plaintiff a GAF score of 50, but noted that at the time of the examination, Plaintiff had been off drugs and alcohol for only five months. Dr. Sherrod observed that "it usually requires that a person be drug free for six to 12 months before they can be accurately diagnosed with mental health problems because the drugs create or exacerbate underlying mental health symptoms." (AR 259.) Plaintiff argues that the ALJ erred in declining to assign greater weight to Dr. Sherrod's assessment and that, although the ALJ stated that "to the extent the claimant's psychiatric consultative examination suggests greater than moderate difficulties, the conflict shall be resolved in favor of the Mental Health Cooperative (MHC) assessments" (AR 5), he did not actually resolve the conflict in favor of MHC.

In short, the ALJ's treatment of Dr. Sherrod's opinion and his conclusions regarding Plaintiff's mental RFC are supported by substantial evidence in the record. The ALJ specifically concluded, in the context of determining whether Plaintiff's mental impairments met or medically equaled the criteria of Listings 12.04, 12.06 or 12.08, that Plaintiff had mild restrictions in the area of activities of daily living ("ADL"), moderate difficulties in social functioning, and moderate difficulties with regard to concentration, persistence and pace. In support of these conclusions, the ALJ observed that, although Plaintiff alleged severe difficulties in ADLs, in the interim period between the original alleged onset date and the amended onset date she went to work as a seamstress, and that the record also indicated she had no difficulty with personal hygiene and was able to use mass transportation. (AR 13.)

In support of his finding that Plaintiff was only moderately limited in the area of social functioning, the ALJ noted that Plaintiff had supplied conflicting written statements and oral testimony, indicating in written materials that she was always able to get along with others, but later testifying that she had difficulty getting along with others, including coworkers. Notwithstanding, she was able to work as a seamstress for over a year just prior to the amended disability onset date, and the record reflects she had no difficulty interacting with various mental and physical health care practitioners, and maintained close relationships with several family members. Further, according to her own testimony, it was through networking at her church that she found the seamstress job in the first place. On the basis of this evidence in the record, the ALJ stated, "To the extent that the claimant's psychiatric consultative examination [*i.e.*, Dr. Sherrod's assessment] suggests greater than moderate difficulties [in the area of social functioning], the conflict shall be resolved in favor of the MHC assessments in light of her treatment

history and because the consultative examination came at a point shortly following the claimant's drug abuse, so that the claimant was in the initial stages of extended sobriety at that point." (AR 14.) As indicated above, the CRGs from MHC all indicated no more than moderate restrictions in the area of social functioning. (AR 433 (5/2/2008 Reassessment CRG); 436 (6/20/2008 Reassessment CRG); 439 (9/7/2007 Reassessment CRG); 442 (12/4/2006 Intake CRG).)

The ALJ also found Plaintiff to have moderate limitations in concentration, persistence and pace. He recognized that Plaintiff alleged marked difficulties in this area, but also noted that MHC assessments all found only moderate limitations in this area, and Dr. Sherrod found, on the basis of Plaintiff's objective performance on standard tasks, that Plaintiff was only mildly limited in this area. For instance, as the ALJ noted, Plaintiff exhibited a "good fund of general knowledge, and was able to recite a number of basic facts. Her concentration was found to be adequate in repeating rote numbers; she could repeat six number in a row forward and three backward, could add or subtract simple problems in her head, knew what the weather was like the day before the evaluation, and could imitate five of eight finger-tapping patterns." (AR 14.) The ALJ found it even more significant that, subsequent to Dr. Sherrod's evaluation, Plaintiff "had worked for a number of months as a seamstress, and in earlier statements, the claimant noted she continues to sew as a hobby; she indicated she is able to cook meals, pay bills, count change, handle a savings account, and use a checkbook." (AR 14.)

The ALJ considered Plaintiff's limitations in all these areas again in the context of determining her mental RFC, which he expressly found to be supported "with some qualification, by the opinion of Kathryn Sherrod, Ph.D." for basically the same reasons as set forth above. He rejected Dr. Sherrod's opinion regarding Plaintiff's "severely limited" social skills because Plaintiff "was able to sufficiently interact and network with others so as to allow her to resume employment as a seamstress . . . some months after the assessment was recorded," and because Dr. Sherrod's assessment took place just months after Plaintiff had become sober.

These determinations are all supported by substantial evidence in the record. As the Commissioner points out, an ALJ is entitled to rely on the opinions of both examining and non-examining medical consultants. 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2); SSR 96-5p (1996 WL 374183). It is also the ALJ's responsibility to make the RFC determination after weighing any conflicting evidence. 20

C.F.R. §§ 404.1546(c), 416.946(c).  The ALJ explained which portion of Dr. Sherrod's opinion he rejected and why, and his decision is adequately supported.

Plaintiff further takes issue with the ALJ's rejection of certain aspects of the MHC CRG evaluations on the basis that they contained inconsistencies.  For instance, the ALJ specifically referred to the 2009 CRG "update" as internally inconsistent because it assigned a GAF score of 48, but assessed moderate limitations in three of four categories and marked limitation in only one area, and because the assessment of "marked" limitations in that area was not actually supported by the treatment notes.  The Court finds, again, that the ALJ's conclusion is supported by substantial evidence in the record as a whole.  Notably, the 2009 CRG update was not significantly different from the 2008 update except that it assigned a GAF of 48 rather than 60.  Under the category "Activities of Daily Living," the only comments provided in support of a finding of marked limitations in that are that the client had a history "of not keeping house clean," and "is currently unemployed."  (AR 433.)  In fact, the only support for the suggestion that Plaintiff did not keep her house clean was Plaintiff's own report upon intake in 2007.  Otherwise, the record reflects that each time a MHC case manager visited Plaintiff's apartment, he or she noted that the residence was clean.  The fact that Plaintiff was unemployed had very little bearing on her ability to maintain activities of daily living (except that the record suggests generally that Plaintiff did much better in all areas when she was employed than when she was not).  The record supports the ALJ's conclusion that a finding of "marked" limitations in this category was not supported by the treatment record, and also supports the ALJ's determination that a GAF of 48 was not an accurate reflection of Plaintiff's capabilities.

Finally, Plaintiff also argues that because Dr. Sherrod's CE was performed in March 2007, "the ALJ should have sent the claimant for another psychological CE after the 6-12 month time period had passed."  (Pl.'s Brief at 12.)  She asks that the case be remanded so that Plaintiff's mental health condition can be properly evaluated.  (*Id.*)  In that regard, however, the Court notes, pursuant to Sixth Circuit precedent:

> The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  Only under special circumstances, *i.e.*, when a claimant is without counsel, is not capable of presenting an effective case, and is unfamiliar with hearing procedures, does an ALJ have a special, heightened duty to develop the record.

*Nabours v. Comm'r of Soc. Sec.*, 50 F. App'x 272, 275 (6th Cir. 2002) (citations omitted). Plaintiff here has at all relevant times been represented by an attorney, and she has not provided a legitimate basis for remand in order to further develop the record. As it stands, the record adequately supports the ALJ's decision to reject in part Dr. Sherrod's assessment in favor of the less restrictive non-examining consultant's opinions.

   **B.     Whether the ALJ erred in concluding that Plaintiff had no more than moderate mental limitations based solely on her GAF scores**

Plaintiff asserts that the ALJ concluded that Plaintiff had a GAF score of 60, and erred in ignoring the GAF scores assigned over the years ranging from 45 to 50. Plaintiff further argues that the ALJ erred in concluding that Plaintiff had no more than moderate mental limitations "based solely on her GAF scores and by discounting and discrediting the Plaintiff's treatment records from MHC." (Pl.'s Brief at 14.)

In fact, the ALJ's assessment of Plaintiff's mental residual functional capacity was not based "solely" upon her GAF scores and he did not expressly adopt a finding that Plaintiff had a GAF of 60. Rather, he noted that in 2009, Plaintiff experienced a worsening of her symptoms in connection with losing her job and the death of her sister. He also noted that "the very latest psychiatric entry in the record" reflected that Plaintiff reported she was "doing fine." (AR 579.) He then noted in passing that the GAF score of 60, recorded in 2008, near the point of the amended alleged onset date "reflects a trend that favors ongoing improvement." (AR 17–18.)

Plaintiff correctly notes that GAF scores are not considered by the Commissioner or the Sixth Circuit to have any direct correlation to the severity requirements of the mental disorders listings, and that the Commissioner has declined to endorse the GAF score for use in Social Security programs. *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007) (citing 65 F. Reg. 50746, 50764–65 (Aug. 21, 2000)) (other citations omitted). Consequently, greater weight is to be given the treatment notes and a claimant's subjective complaints than to highly subjective GAF scores. *See Smith v. Astrue*, 565 F. Supp. 2d 918, 925 (M.D. Tenn. 2008) (noting that a GAF score is not determinative of a plaintiff's ability to function and should not be used to discredit the treating physician's assessment of the plaintiff's limitations). The ALJ complied with that directive insofar as he apparently gave very little weight to the GAF scores, other than to implicitly conclude that Plaintiff was operating at a level above the latest score of 48. This contention of error is without merit.

C. **Whether the ALJ erred at Step 5 of the sequential evaluation in finding that a significant number of jobs exist in the regional or national economy that Plaintiff could perform**

The ALJ found that a significant number of jobs existed in the regional and national economies that Plaintiff could perform, specifically including the representative occupations of laundry folder (800 jobs in the Tennessee regional economy and 40,000 jobs nationally) and laundry ticketer (1,900 jobs in the Tennessee regional economy and 215,000 jobs nationally) (for combined totals of 2,700 jobs regionally and 255,000 nationally). (AR 21.)

Plaintiff points to a number of cases finding as a matter of law that the number of positions available under the facts of those cases were found to be not "significant." *See, e.g.*, *West v. Chater*, No. C-1-95-739, 1997 WL 764507, at *3 (S.D. Ohio Aug. 21, 1997) (holding as a matter of law under the particular facts of that case that "100 jobs locally, 1,200 jobs statewide and 45,000 jobs nationally do not constitute a significant number of jobs under 42 U.S.C. § 423(d)(2)([A])"; *Tapp v. Sec'y of Health & Human Servs.*, No. 1:90CV1214, 1991 WL 426310, at *1 (N.D. Ohio July 18, 1991) (where the testifying vocational expert identified only one job the plaintiff could perform—surveillance system monitor—and indicated that 200 such jobs existed locally, 400 to 500 existed in the Northeastern Ohio area, 1,500 to 2,000 existed statewide, and approximately 30,000 existed nationally, the court held that the numbers identified did "not represent employment opportunities existing in significant numbers in the local and/or national economy"). Those cases, of course, are not particularly relevant to a situation in which at two jobs have been identified, of which there exist 2,700 positions regionally and 255,000 nationally.

Plaintiff also seeks to rely on *Whitaker v. Secretary of Health & Human Services*, No. 93-154, 1994 WL 780933, at *4 (E.D. Ky. Dec. 13, 1994). In that case, the ALJ had determined that the plaintiff, who was physically restricted to a limited range of work at the sedentary level, could perform the jobs of cashier II, hand packer, machine tender, and surveillance monitor. The vocational expert testified that there were, collectively, 3,600 of these jobs in the "local" economy. The ALJ concluded that the VE was a credible witness and that 3,600 jobs was a significant number, and therefore held that the plaintiff was not disabled. The district court reversed and remanded for additional consideration, finding that the VE's reference to the "local" economy was impermissibly vague, that there were serious concerns regarding the VE's credibility, and that no inquiry had been made into any of the factors the Sixth Circuit has

identified as relevant in making the determination of whether a certain number of jobs is "significant" under the particular facts, including "the level of the claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of traveling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on."  *Id.* at *4 (quoting *Hall v. Bowen*, 837 F.2d 727 (6th Cir. 1988)); *see also Born v. Sec'y of Health & Human Servs.*, 923 F.2d 1168, 1174 (6th Cir. 1990) (holding that the decision of what constitutes a "significant" number of jobs "must be made on a case-by-case basis and ultimately must be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation").

It is noteworthy, however, that the Sixth Circuit found in *Hall* that the number of positions available in that case, 1,350–1,800 in the metropolitan area in which the plaintiff lived, was "significant." The court noted that the regulation interpreting 42 U.S.C. § 423(d)(2)(A) further elaborates:  "Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered "work which exists in the national economy."  *Hall*, 837 F.2d at 275 (quoting 20 C.F.R. § 404.1566(b)).

On this basis, and under the particular facts presented here, the Court concludes that 255,000 jobs in the national economy represents a significant number.  Plaintiff lives in a metropolitan area, is capable of getting around using public transportation, and has much less serious occupational restrictions than the plaintiffs in either *Hall* or *Born*.  The Court's determination that the number of jobs identified exist in significant numbers is supported by substantial evidence.

D.    **Whether the ALJ erred by failing to include manipulative limitations in the RFC he assigned to Plaintiff**

The ALJ found Plaintiff's osteoarthritis to be a severe impairment, but he did not consider whether osteoarthritis in Plaintiff's hands would have a substantial effect on Plaintiff's ability to perform the jobs named by the VE.  The Plaintiff contends this failure was in error.  The Court finds that this contention too is without merit.

The ALJ considered Plaintiff's subjective complaints, including testimony that her arthritis affected all the joints of her body, but noted that the majority of her testimony was focused on her mental impairments.  The ALJ observed that Plaintiff had also complained in earlier written statements that her

arthritis was so severe that she was unable to use her hands at all. However, the ALJ reasonably declined to fully credit those statements in light of the fact that Plaintiff went to work part-time as a seamstress just weeks after making those statements. As a seamstress, Plaintiff was engaged in hemming pants and putting patches on uniforms, doing both hand stitching and operating a sewing machine. The ALJ also noted that the medical history showed that the vast majority of Plaintiff's physical complaints and emergency room visits were "not particularly centered around her arthritis," and that there was very little objective evidence in the record to confirm that she actually had arthritis in her hands or disabling joint pain generally. (AR 16.) The Court finds that the ALJ's formulation of Plaintiff's physical residual functional capacity, which limited her to light work with only occasional postural activities, is supported by substantial evidence in the record. The ALJ did not commit reversible error in failing to include "manipulative limitations" in the Plaintiff's RFC.

E.      Whether the ALJ improperly evaluated Plaintiff's credibility under SSR 96-7P

SSR 96-7p states that its purpose is to "clarify when the evaluation of symptoms, including pain . . . requires a finding about the credibility of an individual's statements about pain or other symptom(s)." SSR 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996). The Ruling emphasizes that

> [i]t is not sufficient [for an ALJ] to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well- reasoned determination or decision.

*Id.* at *4.

Plaintiff appears to be arguing that the ALJ in this case violated this directive by making a conclusory statement to the effect that the Plaintiff's allegations had been considered, and by failing to state specifically whether he found Plaintiff's testimony to be credible or not credible or the weight assigned her testimony.

The Court finds that this contention too is without merit. As suggested above, the ALJ specifically found in his opinion that Plaintiff's complaints regarding the intensity and duration of her physical pain and the limitations resulting from her psychiatric disorders were not credible to the extent they were

inconsistent with the residual functional capacity he ascribed. And he explained why: The objective medical history did not fully substantiate Plaintiff's claim of disabling physical pain and because, just weeks after making the written statements attesting to her inability to use her hands at all, among other problems, she began working part-time as a seamstress.

With regard to her credibility generally, and in particular regarding her psychiatric impairments, the ALJ further noted that there were numerous statements in the record that were inconsistent or in conflict with other evidence in the record, sufficient to "affect her credibility in a general sense." (AR 19.) Specifically, the ALJ noted that Plaintiff alleged she did not have a driver's license due to an unpaid traffic ticket, but that this testimony failed to account for the fact that she had previously been arrested for a DUI and charged with driving without a license. She also claimed in one written statement that she always got along with others, but testified at the hearing that she had difficulty getting along with co-workers and supervisors. She also reported having been charged with assault on more than one occasion. She claimed she was frequently absent from her last seamstress job due to feeling bad, but the ALJ noted that her earnings statements did not vary substantially from one quarter to the next, suggesting her work schedule was fairly consistent. And again, she claimed disabling pain and inability to use her hands at all just weeks before beginning work as a seamstress.

In short, the Court finds that the ALJ complied with his obligations under SSR 96-7p in weighing Plaintiff's credibility and reaching a determination that her allegations of disabling pain and psychiatric conditions were not fully credible. His conclusions are supported by substantial evidence in the record.

**F.    Whether the ALJ failed to properly evaluate and consider Plaintiff's severe impairment of COPD**

Again, the Court finds, for the reasons set forth above, that the ALJ's RFP assessment is supported by substantial evidence in the record. Specifically with respect to Plaintiff's COPD diagnosis, the ALJ concluded that the medical record showed only intermittent problems with breathing. He noted Plaintiff was diagnosed with acute bronchitis in March 2006; in April 2007, there was an objective finding of some airway obstruction which needed to be confirmed through a chest x-ray, but there is no such confirming study in the record. In February 2008, Plaintiff presented with coughing symptoms secondary to what appeared to be a viral infection, but with no signs of wheezing or labored breathing. Between June and September 2008, Plaintiff complained of painful coughing and later returned to the emergency

department complaining that she was spitting or coughing blood.  She was diagnosed with pneumonia but radiologic studies at that time were unremarkable except to note a "possible infiltration involving the left lower lobe and subsegmental atelectatic changes of both lung bases."  (AR 637, 651, 653.)  In January 2009, Plaintiff again presented with coughing symptoms, and at this time a radiology study affirmatively indicated COPD.  The record also reflects, however, that apart from coughing Plaintiff was not in respiratory distress.  Visits to treating professionals in April and June 2009 likewise do not suggest Plaintiff was in respiratory distress at those times.

The ALJ concluded that the COPD diagnosis was of recent onset and that there was no objective evidence in the record suggesting Plaintiff was substantially limited by the condition to such an extent that she needed restrictions in her RFC more limiting than those the ALJ found.  Specifically, he found that Plaintiff should avoid any exposure to irritating inhalants.  (AR 15.)  The Court finds that the ALJ appropriately accounted for Plaintiff's COPD, and his determination is supported by substantial evidence in the record.

V.    **CONCLUSION**

For the reasons set forth above, the Court finds that the ALJ's determination that Plaintiff was not disabled at the time of the hearing, for purposes of the Social Security Act, is supported by substantial evidence in the record.  The Court will therefore deny Plaintiff's motion for judgment and affirm the Commissioner's decision.  An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge